[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff ("ABC") took title to the residence of the defendant, Mr. Mango, by way of foreclosure on September 17, 1993. ABC allowed Mr. Mango to remain in possession and, at his request, on May 17, 1994 the parties entered into an agreement, which was carried into effect by way of two documents, a Use and Occupancy Agreement and a Purchase Agreement executed on or about July 18, 1994. Pursuant to the May 17 agreement, characterized as a "lease/purchase option" in the letter of agreement, ABC would lease the property to Mr. Mango for 24 months at a monthly rental of $1,394.58. At the end of the lease period, assuming satisfactory performance by Mr. Mango, title would be transferred to him subject to a mortgage, the anticipated CT Page 15382 terms of which were spelled out in the letter of agreement. Closing and transfer of title was to have been on August 1, 1996.
Although the letter (Exh. N) stated that ABC "will sell" the property to Mr. Mango, "will transfer title" to him and "will grant (him) a mortgage on the property", it is clear from its overall tone and its specific provisions that there were several conditions precedent to either party being obligated to the purchase and financing transaction. For example, the letter provided that "any default under the lease may result in forfeiture of deposit monies and any credits toward the purchase of you (sic) home" and would subject Mr. Mango to "immediate eviction proceedings". The financing terms stated in the agreement were explicitly made "subject to (ABC) underwriting guidelines". Finally, Mr. Mango accepted the agreement only "subject to review of lease and appraisal".
The first-mentioned contingency was spelled out further in the Purchase Agreement, which provided that any "default under the terms of the Use and Occupancy Agreement shall constitute a default of this (Purchase) Agreement". Sec. 9. The Purchase Agreement also contained a liquidated damages clause allowing ABC to retain "all sums of money paid in accordance with" the agreement, Sec. 14, including payments made under the Use and Occupancy Agreement, which had been incorporated by reference into the Purchase Agreement. Sec. 9.
Mr. Mango paid the $20,000 down payment required by the agreement and paid the stipulated use and occupancy amount only until November 1994, when he defaulted. This action followed, based on the Use and Occupancy Agreement. Mr. Mango has remained in possession throughout the course of proceedings in this case, paying $950 monthly since April 1995, pursuant to an earlier order of the court (McDonald, J.).
The factual allegations of the complaint are not seriously in dispute; viz., that Mr. Mango retained possession of the property pursuant to the Use and Occupancy Agreement, and that he failed to make payments due under the agreement after November 1994. ABC seeks possession of the premises and retention of the amounts paid, as liquidated damages. By way of an amended answer[1]
Mr. Mango defends on two grounds. First, he claims that the Use and Occupancy Agreement is void because ABC failed to make certain disclosures required by the state Truth in Lending Act (TILA), C.G.S. §§ 36a-675 et seq., and the federal CT Page 15383 Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq.[2]
Second, he claims that the liquidated damages provided for in the Purchase Agreement in the form of the $20,000 non-refundable down payment is excessive, has no relation to actual damages and constitutes a penalty clause, against the public policy of the state.[3]
1. TILA[4]
Connecticut's TILA essentially incorporates the substantive provisions of Subchapter I of the federal Consumer Credit Protection Act. It requires that certain disclosures be made concerning the consumer's rights in a "closed-end credit transaction". These disclosures, which are listed in ¶ 5 of count one of Mr. Mango's counterclaim, must be made before "consummation" of the transaction, pursuant to the regulations implementing the federal Act. See 12 C.F.R. § 226.17(b). While the parties agree that the transaction here was a "closed-end credit transaction", they differ on whether consummation occurred when the agreements at issue here were signed and, therefore, whether ABC had to have made the required disclosures prior to that time.
Though not defined in the legislation, the term "consummation" is defined in the regulations as "the time that a consumer becomes contractually obligated on a credit transaction". 12 C.F.R. § 226.2(13). And the Official Staff Interpretation of the regulation further clarifies the term's practical meaning by providing that:
 [c]onsummation does not occur when the consumer becomes contractually committed to a sale transaction, unless the consumer also becomes legally obligated to accept a particular credit arrangement. For example, when a consumer pays a nonrefundable deposit to purchase an automobile, a purchase contract may be created, but consummation for purposes of the regulation does not occur unless the consumer also contracts for financing at that time.
This did not occur here because neither party was bound to the terms of the financing for the purchase of the property in question at the time the agreement of May 17 or the implementing documents of July 18 were signed. CT Page 15384
Mr. Mango relies on Murphy v. Empire of America, FSA,746 F.2d 931 (2d Cir. 1984), but that case holds that "(t)he transaction is consummated when the lender and borrower sign a contract obligating them, respectively, to lend and to borrow the funds". Id., 934. As shown in the review of the terms of the agreements, above, that was not the case here. Indeed, the court in Murphy found that an earlier change in the regulations defining "consummation" made clear "that consummation would occur only when contractual obligations bound the parties to the creditterms, not when there had merely been some investment in the transaction, such as the making of a non-refundable deposit". (Emphasis added.) Id., 933, n. 1. Because the disclosure requirements of the TILA do not come into play until the parties are bound on the credit terms for the purchase transaction, it is not inconsistent, as Mr. Mango argues, for him to be bound on the Use and Occupancy Agreement but for the disclosure obligation not to have matured.
I find as a matter of law, given the facts adduced in the testimony and the terms of the documents introduced into evidence, that a binding agreement for the extension of credit did not exist between ABC and Mr. Mango. See The Dacourt Group,Inc. v. Babcock Industries, Inc. et al., 747 F. Sup. 157, 160
(D. Conn. 1990). While there was contemplation, there was not consummation and, consequently, no obligation to make the disclosures called for by TILA.[5]
Accordingly, Mr. Mango's second affirmative defense and count one of his counterclaim must fail. Because what remains of his count two[6] is founded on a claim that ABC knew the agreement violated TILA, that count, too, must fail.
2. Liquidated Damages
The remaining count of Mr. Mango's counterclaim seeks the return of his $20,000 down payment, claiming that ABC is unjustly enriched by its retention, that the liquidated damages provided for in the Purchase Agreement bear no relation to actual damages ABC suffered and, therefore, that the liquidated damages clause constitutes a penalty, enforcement of which would be against the public policy of Connecticut.[7]
Liquidated damages clauses are enforceable if "(1) the damage which was to be expected as a result of a breach of contract was CT Page 15385 uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable". NorwalkDoor Closer Co. v. Eagle Lock Screw Co., 153 Conn. 681, 686
(1966). Since ABC is seeking to enforce this provision, it bears the burden of persuasion as to its enforceability.Vines v. Orchard Hills, Inc., 181 Conn. 501, 511 (1980).
Section 14 of the Purchase Agreement provides that, for a breach of the Use and Occupancy Agreement, "the Seller may hold and retain all sums of money paid in accordance with this Agreement as damages for the breach of this Agreement. . . ." The section goes on to label such a sum "liquidated damages". It spells out the "considerations" upon which it is based and recites the parties' agreement that "exact determination of the damages is not possible".
In the Norwalk Door Closer case, supra, the Supreme Court spelled out the scope of the damages a seller of real property may legitimately claim from the failure of the prospective purchaser to go through with the deal.[8] Having in mind the breadth of the permissible damages ABC might have claimed here and the "considerations" spelled out in the agreement, I find the liquidated damages clause to be reasonable. ABC agreed to hold the property off the market for two years even though it was in its best economic interest to liquidate the property and use the proceeds for investment purposes. See Transcript, p. 40. The agreement, itself, demonstrates the parties' intent to liquidate damages in advance, and the uncertainty of and difficulty in proving damages is also clear from the agreements and the facts as they have developed. Therefore, I find the liquidated damages clause to be enforceable.
Accordingly, count three of Mr. Mango's counterclaim must fail.
As indicated at the outset of this memorandum, there is really no question that Mr. Mango breached the Use and Occupancy Agreement. By its terms ABC is entitled to possession of the premises in question. Moreover, ABC is entitled, by virtue of the liquidated damages clause of the Purchase Agreement, into which the Use and Occupancy Agreement was incorporated by reference, to all of the money paid by Mr. Mango under the latter.
Accordingly, judgment shall enter for the plaintiff on the CT Page 15386 complaint. The plaintiff shall be entitled to immediate possession of the premises on Ice House Rd., Watertown, occupied by Mr. Mango and to retain the sum of $28,025.27 as liquidated damages. Judgment shall enter for the plaintiff on all counts of the counterclaim.
BY THE COURT,
Shortall, J.